2006 BNH 038
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:

| | |
|---|---|
| Newfound Lake Marina, Inc., and | Bk. No. 04-12192-MWV |
| Newfound Marine, Inc., | Bk. No. 04-13727-MWV |
| Debtors | Jointly Administered |
| | Chapter 11 Cases |

*William S. Gannon, Esq.*
*WILLIAM S. GANNON PLLC*
*Attorney for Debtors*

*Joseph A. Foster, Esq.*
*Ralph F. Holmes, Esq.*
*MCLANE, GRAF, RAULERSON & MIDDLETON, P.A.*
*Attorneys for Sumac Corporation*

## **MEMORANDUM OPINION**

Before the Court is the determination of the amount of Sumac Corporation's ("Sumac") allowed claim. Newfound Lake Marina, Inc., and Newfound Marine, Inc. (individually, "Newfound Lake Marina" and "Newfound Marine," and collectively, the "Debtors"), objected to Sumac's proof of claim. The essence of the dispute involves a forbearance agreement (the "Agreement") entered into by the parties, who disagree on how much debt was reduced thereby. The allowed amount of Sumac's claim substantially depends on the outcome of this issue. The Court took the matter under advisement at the close of a June 7-8, 2006, trial.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## BACKGROUND

The Debtors operate a marina. William Robertie is the president and sole shareholder of both Newfound Lake Marina and Newfound Marine. In 1990, Newfound Lake Marina borrowed $1,125,000 from Homebank, FSB, secured by a mortgage and security interest in Newfound Lake Marina's real and other property. In 1993, Newfound Lake Marina transferred all of its property, except the real estate, to Mr. Robertie, who, in turn, transferred the property to Newfound Marine. In 1994, Resolution Trust Company, as receiver for Homebank, assigned to Sumac all of Homebank's rights under the note and the mortgage and security agreement. On grounds that the property that Mr. Robertie transferred from Newfound Lake Marina to Newfound Marine was subject to the mortgage and transferred in violation of the mortgage, Sumac demanded that Newfound Marine grant it a security interest in substantially all of Newfound Marine's assets, which Newfound Marine did.

Sumac was established solely for the purpose of acquiring the Newfound Lake Marina note. Sumac's principal is P. Andrews McLane, who formerly was a trustee of Grey Rocks Land Trust, which is owned by Mr. McLane's extended family and is an abutter of the marina. Grey Rocks Land Trust had been involved in unsuccessful litigation to prevent the Debtors from constructing a boat storage building that will be discussed below.

From the time Sumac acquired the note until the present, the Debtors have been in default. In 1995–1996, rather than foreclosing on the note, Sumac proposed that the Debtors transfer approximately twenty-five acres of their land in exchange for Sumac's forbearance of a portion of the debt owed Sumac.[1] Conveyance of this approximately twenty-five acre parcel ("Lot 2"), consisting mostly of undevelopable wetlands and flood plain, would leave the Debtors with five acres on which to continue to operate their marina. Save for one boat storage building, Lot 2 contained no structures and was not being used in the business of the marina. The Debtors sought permission from the town of Hebron to subdivide

---

[1] Apparently there is no written agreement providing for the transfer.

the property and received conditional approval on February 7, 1996, with the town reserving the right to remove Lot 2's boat storage building. The Debtors conveyed Lot 2 to Sumac by a warranty deed dated April 26, 1996. The deed required the Debtors or the town to remove the boat storage building within two years. On the same date that the deed was signed, the parties met to further discuss the conveyance and Sumac's forbearance. On April 30, 1996, Sumac sent a draft Agreement to the Debtors that proposed reducing the principal amount due from $1,107,804.64 to $700,000. During the next year, Sumac sent several letters to the Debtors inquiring about the acceptability of the proposed Agreement, yet the Debtors failed to respond or propose amendments to the document. On June 12, 1997, the Debtors expressed their desire to execute the Agreement "as is," and the Agreement was executed soon thereafter.

The Agreement, in the following passages, provides a breakdown of the balance owed Sumac, reduces the principal amount due, changes the annual interest rate from nine percent to ten percent, calls for reduced monthly interest payments during the forbearance period, and provides for compounding unpaid interest during the forbearance period:

> For well over a year we have discussed restructuring the obligations of the Obligors to Sumac. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Obligors jointly and severally have agreed to the terms set forth below. This agreement ratifies in writing the terms and agreements the parties hereto agreed to in May, 1996.
>
> A. <u>Acknowledgment of Debt</u>. Each of the Obligors acknowledge and agree that Sumac has no obligation to make further loans to any of the Obligors. The unpaid balance of the Note is as follows:
>
> | | |
> |---|---:|
> | Principal (as of 5/30/95) | $1,107,804.64 |
> | Interest (as of 5/30/95) | 199,269.79 |
> | Late Charges (as of 7/27/94) | 20,214.14 |
> | Costs and Fees (Estimated) | 150,000.00 |
> | TOTAL | $1,477,288.57 |
>
> (These figures do not include interest, late charges, costs and fees that have accrued from the dates indicated.)

. . . .

  C. Principal Reduction and Payment and Interest Under the Note.  The principal amount owing under the Note shall be deemed to be reduced to $700,000 as of the date hereof.  The Note shall bear interest at 10% per annum based on a 360 day year.  The Obligors shall pay interest on the Note monthly on the first day of each month, provided, however, the Obligors may accrue such monthly interest payments in excess of (i) $2,000 from the date hereof through December 31, 1997 and (ii) $2,500 from January 1, 1998 through June 15, 1998.  All interest accrued and not paid shall be added to the principal amount of the Note (the "Accrued Interest").  Provided there has been no occurrence of an Event of Default (as defined in Paragraph K hereof) on or before June 15, 1998, Sumac shall forgive 50% of the Accrued Interest from the principal amount of the Note.

The Agreement also provides that it is governed by Massachusetts law.

Despite the reduced principal and interest payments, the Debtors failed to make the payments required under the Agreement.  The Debtors sometimes went months without making a payment.  Nevertheless, Sumac held off calling the note for years.  As of the time that Newfound Lake Marina filed its Chapter 11 petition on June 17, 2004, the Debtors had been in almost continuous default since Sumac acquired the note in 1994.  Sumac filed a proof of claim for $1,915,088.84, to which the Debtors objected.  Sumac has since revised the amount it seeks to approximately $1,772,161.10.

## DISCUSSION

According to the Debtors, the Agreement's language is ambiguous, especially in light of the parties' intentions in entering the Agreement.  The Debtors allege that Sumac forced the conveyance of Lot 2 and forced the Agreement upon the Debtor in an effort to downsize the marina and make it impossible for the Debtors to ever pay off the debt.  The Debtors also make a related allegation that Sumac failed to disclose the amount of the debt in violation of New Hampshire statutory law.

I. **Ambiguity**

The Debtors argue that Paragraph C of the Agreement reduced the entire balance due on the note to $700,000, while Sumac contends that Paragraph C reduced only the principal to $700,000, leaving the outstanding interest, late charges, costs and fees referenced in Paragraph A unchanged and unforgiven.

    A. **Massachusetts Law**

"A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998). "However, an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." Id. (quoting Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 645 N.E.2d 1165, 1168 (Mass. 1995)). An allegedly ambiguous term, however, must be assessed in the context "of the entire contract, construed in a sensible way in light of the transaction the contract envisions and the purposes the contract was designed to accomplish." Beth Israel Deaconess Med. Ctr., Inc. v. MATEP LLC, 2004 WL 369098, at *5 (Mass. App. Ct. 2004). "[C]ontract interpretation is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention." Shea v. Bay State Gas Co., 418 N.E.2d 597, 600 (Mass. 1981) (quoting United States v. Seckinger, 397 U.S. 203, 213 n.17 (1970)).

    B. **The Language of the Forbearance Agreement**

In light of the foregoing rules of construction, the Court begins its search for ambiguity with the language of the Agreement. Paragraph A provides that, as of certain dates prior to the execution of the Agreement, the balance due totaled $1,477,288.57. This amount is described in Paragraph A as the "balance." This balance is broken down into four categories of outstanding debt: principal $1,107,804.64; interest $199,269.79; late charges $20,214.14; and costs and fees $150,000. Paragraph A

unambiguously uses the term "principal" to describe one component of a larger "balance," which makes sense given that "principal" is defined as "a capital sum, as distinguished from interest or profit." RANDOM HOUSE UNABRIDGED DICTIONARY 1539 (2nd ed. 1993).  Paragraph C, which reduces the debt, states, "The principal amount owing under the note shall be deemed to be reduced to $700,000 as of the date hereof."

      The Debtors contend that the the term "principal amount," as used in that sentence, refers to the entire debt, inclusive of the interest, late charges, fees and costs listed in Paragraph A.  Sumac's position is that the term "principal amount" unambiguously refers only to the principal stated in Paragraph A.  The Court agrees with Sumac.  Paragraph A lists the principal as one portion of the balance due.  Then, Paragraph C reduces the principal.  Had the parties intended the Agreement to reduce the entire balance due to $700,000, Paragraph C could have read, "The *balance* owing under the Note shall be deemed to be reduced to $700,000," or "The *amount* owing under the Note shall be deemed to be reduced to $700,000." Instead, the Agreement uses the term "principal" and unambiguously uses the definitional meaning of "principal" in that sentence and consistently throughout the Agreement.  Paragraph C also provides that unpaid, accruing interest during the forbearance period "shall be added to the principal amount of the Note," further evidence that the Agreement unambiguously uses the term "principal" as defined above. Adoption of the Debtors' position would have the illogical result of giving the term "principal" two different meanings within the Agreement, and even within the same paragraph.  The Court finds that the language of the Agreement unambiguously reduces only the $1,107,804.64 principal to $700,000.

      The Debtors' behavior following their receipt of the proposed Agreement also supports the Court's conclusion that the Agreement's language is not ambiguous and that both parties understood that only the principal would be reduced.  The Debtors received the proposed agreement in May 1996 but did not sign the Agreement until June 1997, despite repeated inquiries from Sumac.  Had Newfound believed

that the Agreement would have reduced its indebtedness by $777,288.57,[2] Newfound likely would have signed sooner.  Moreover, the Debtors never attempted to clarify or amend the language of the Agreement prior to execution, and they failed to correct or respond to Sumac's post-Agreement characterizations of the total indebtedness significantly exceeding $700,000.  For instance, a July 21, 1999, letter from Sumac to the Debtors states how much interest has accrued under the Agreement, then states, "Obviously, the above amounts are in addition to the principal, interest, late charges, costs and fees set forth in the Forbearance Agreement.  All of these obligations continue to accrue resulting in obligations to Sumac well in excess of $1 million."

### C. The Intentions of the Parties and the Purposes of the Forbearance Agreement

The Agreement may yet be ambiguous when examined in light of the parties' purposes and intentions.  The Debtors allege that the Agreement and the conveyance of Lot 2 were part of Sumac's broader strategy to downsize the marina, arguing that Sumac used its superior bargaining position to force the Debtors into conveying Lot 2 as a precondition to entering into the Agreement.  Essentially, the Debtors argue that Sumac intended to hamstring the marina business by forcing the Debtors into giving up income-producing land and then duping the Debtors into believing that the Agreement reduced the debt more than it actually did, leaving the Debtors in such a position that it could never repay the debt.

Lot 2 consists of almost twenty-five acres while Lot 1 retained by the Debtors consists of five acres.  However, with the exception of a boat storage building, the Debtors' business in 1996 was confined to Lot 1.  The Debtors contend that Lot 2 was the marina's future.  However, trial testimony established that little of Lot 2 was available for expansion.  Mr. McLane estimated that up to four or five acres are developable, while Sumac's soil scientist opined that only one-half acre is developable.

---

[2] The total debt of $1,477,288.57 listed in Paragraph A reduced to $700,000 would yield $777,288.57 of forgiven debt.

Newfound presented no convincing evidence that Lot 2 had the development potential to be the "future" of the marina, as asserted by Mr. Robertie.

The Agreement, by reducing only the principal, reduced the debt by $407,804.64, which, based on the evidence before the Court, is significantly more than Lot 2 was worth. Newfound presented no evidence—apart from Mr. Robertie's unsupported testimony that Lot 2 was worth "in the neighborhood of a million dollars"—that Lot 2 was worth more than either its tax-assessed value of $140,000 or Mr. McLane's estimation of $100,000.

After observing Mr. McLane's testimony, the Court is unconvinced of any sinister motive to downsize the marina or otherwise make it impossible for the Debtors to service their debt. Sumac bought the loan as an investment and because Mr. McLane had close ties to the area, as he had been spending time there since he was child. He was concerned with how the marina was operated and he figured that owning the note would allow him to be more knowledgeable about the goings-on at the marina. Despite the note being chronically in default, Sumac held off calling the note for almost ten years. Sumac proposed the Agreement to give the Debtors a fighting chance to pay the debt, but there had to be consideration for the forbearance. The Court finds nothing improper with regard to the transfer of Lot 2, which was valid consideration for the forgiven debt.[3] While removal of the boat storage building might

---

[3] With regard to consideration, apart from acknowledging that consideration has been received, the Agreement only states, "This agreement ratifies in writing the terms and agreements the parties hereto agreed to in May, 1996." While no evidence of any agreements made in May 1996 was presented at trial, the evidence shows that the first part of 1996 was marked by negotiations and developments with regard to the Agreement and the transfer of Lot 2. In a February 8 letter to Sumac's attorney, Debtors' counsel stated, "Now that the subdivision has been approved, [Mr. Robertie] is most anxious to see a proposed Forbearance Agreement." The parties met on April 26, the same day on which Mr. Robertie executed a warranty deed conveying Lot 2 to Sumac. On April 30, a few days later, Sumac's counsel wrote Debtors' counsel, stating, "Enclosed please find a draft of a [Forbearance] Agreement regarding the discussion we had at our meeting last week." The proposed Agreement would have been received by the Debtors in May. The sequence of events and the correspondence between the parties reveals the linkage between the Agreement and the conveyance of Lot 2 and that both parties understood Lot 2 to be consideration for the Agreement. The execution of the deed and the first draft of the Agreement, which both took place in the final days of April 1996, are "the terms and agreements the parties hereto agreed to in May, 1996" cited in the Agreement.

have been beneficial to the Grey Rocks Land Trust, this benefit was not the driving force behind Sumac's actions and there is no evidence that Sumac acted in bad faith or made misrepresentations to the Debtors. After consideration of the parties' intentions, the Court finds that the Agreement is not ambiguous.

## II. New Hampshire RSA ch. 399-B:2

In conjunction with their argument that the Agreement is ambiguous, the Debtors argue that Sumac deceived the Debtors by not disclosing the actual and precise amount of the debt at the time of the Agreement. In particular, the Debtors argue that Sumac violated New Hampshire's finance charge disclosure statute, which provides:

> Any person engaged in the business of extending credit shall furnish to each person to whom such credit is extended, concurrently with the consummation of the transaction or agreement to extend credit, a clear statement in writing setting forth the finance charges, expressed in dollars, rate of interest, or monthly rate of charge, or a combination thereof, to be borne by such person in connection with such extension of credit as originally scheduled.

N.H. REV. STAT. ANN. § 399-B:2 (2006).

Questions remain with regard to whether this New Hampshire statute applies to the Agreement, whether Sumac is "engaged in the business of extending credit," whether Sumac has ever extended credit to the Debtors, and whether the Agreement was an "agreement to extend credit." Nonetheless, assuming *arguendo* that the statute applies to the Agreement, the Court finds that Sumac's actions have not violated the statute's disclosure requirements. Contrary to the position of the Debtors, the statute does not require that the Agreement quantify the total debt down to the penny. The purpose of the statute is to ensure that a lender provide to a borrower information disclosing the true costs of a loan. Bank of New Hampshire v. Scanlon, 743 A.2d 842, 843–44 (N.H. 1999). The Agreement's Paragraph C provides a clear statement of the interest rate, and that interest accruing during the term of the Agreement will be added to the principal. Paragraph A provides a breakdown of the balance. Even though the figures are "as of 5/30/95," "as of 7/27/94," or "Estimated," Paragraph A adequately discloses the outstanding debt,

especially in a document that *reduces* debt.  This is not a situation in which a lender misleads a borrower into assuming debt.

### III.  Calculating the Amount of Sumac's Allowed Claim

Having held that the Agreement reduced only the principal to $700,000, the task remaining is to calculate the allowable amount of Sumac's claim.  The parties are ordered to submit proposed figures based on the following findings and rulings.  First, as the Agreement expressly provides for compounding whereas the promissory note does not, the Court finds that interest compounded only during the forbearance period, ending on June 15, 1998.  Interest accruing before and after the forbearance period shall not be compounded.  Second, for the time when the 9% annual interest rate applies, the monthly interest rate shall be 0.75%, and for the time when the 10% annual interest rate applies, the monthly interest rate shall be 0.8333%.  Third, the Agreement changed the annual interest rate to 10% for the life of the loan rather than only during the forbearance period.  Fourth, Paragraph 3 of the promissory note contains a provision that on the first and second anniversaries of the note the Debtors shall pay "an additional interest payment equal to one percent (1.0%) of the principal balance remaining unpaid.  This provision is applicable.

Sumac's asserted claim breaks down as follows:

| | |
|---|---:|
| Outstanding balance on loan from 6/11/97 to 5/30/04 | $1,183,159.65 |
| Per diem after 5/30/04 | 319.95 |
| Interest as of 5/30/95 | 199,269.79 |
| Interest from 5/30/95 to 6/11/97 | 174,759.83 |
| Late charges prior to 7/27/94 | 20,214.14 |
| Late charges from 7/27/94 to 5/30/95 | 4,238.31 |
| Late charges from 6/1/95 to 6/11/97 | 8,585.67 |
| Real estate taxes/costs/fees from 8/24/96 to 6/17/04 | 176,174.61 |
| Interest from 6/1/04 to 6/17/04 | 5,439.15 |
| | $1,772,161.10 |

The Court allows some of these amounts and disallows others.  The $199,269.79 and $20,214.14 figures are listed in the Agreement and were therefore agreed upon by the execution of the Agreement, and are

allowed.  The $174,759.83 figure is not based on compounded interest and is allowed.  The $8,585.67 figure is based upon the principal recited in Paragraph A of the Agreement and is not based on compounded interest, and is allowed.  The $4,238.31 figure is not based on compounded interest and is allowed.  The real estate taxes, costs and fees of $176,174.61 were stipulated to at trial, with the exception of $8,625, and are allowed in the amount of $167,549.61.  However, the amounts of $1,183,159.65 and $319.95 are based on a compounded monthly interest rate of 0.84% and, therefore, are not allowed.  The $5,439.15 appears to result from compounded interest and is also not allowed at this time.  Based upon the above findings, rulings, and allowances, the parties shall submit to the Court proposed figures for the categories outstanding on or before October 20, 2006.

## CONCLUSION

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

DATED this 6th day of October, 2006, at Manchester, New Hampshire.

                                                          /s/ Mark W. Vaughn
                                                          Mark W. Vaughn
                                                          Chief Judge