2007 BNH 035
_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | |
| Newfound Lake Marina, Inc., and | Bk. No. 04-12192-MWV |
| Newfound Marine, Inc., | Bk. No. 04-13727-MWV |
|               Debtors | Jointly Administered |
| | Chapter 11 Cases |

*William S. Gannon, Esq.*
WILLIAM S. GANNON PLLC
*Attorney for Debtors*

*Joseph A. Foster, Esq.*
*Ralph F. Holmes, Esq.*
MCLANE, GRAF, RAULERSON & MIDDLETON, P.A.
*Attorneys for Sumac Corporation*

## MEMORANDUM OPINION

This case involves a marina business in which a secured creditor objects to the allowance of the claim of the marina's owner. In the alternative, the creditor requests that the Court recharacterize the claim as equity. The Court held a one-day trial on October 23, 2006, at the close of which it took the matter under advisement.

### JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

### FACTS

William J. Robertie ("Robertie") purchased a marina in 1986 and operated it through Newfound Lake Marina, Inc. ("Marina"), until 1993, when he formed Newfound Marine, Inc. ("Marine"), which

became the operator of the marina business; Marina continued to own the real property. (Ex. 12.) Since Robertie bought the marina, he has been its sole principal, officer, director, and shareholder. Until 1998, Robertie's grandmother, Phyllis Robertie ("Phyllis"), maintained the business ledgers.

There is a series of documents executed by Robertie dated June 1, 1993, that shed *some* light on the relationships between the Debtors, Robertie, and Phyllis. These documents include memoranda of debt, security agreements, transfers of property, and bills of sale. Two documents state that Robertie owed Phyllis $486,521[1]—secured by various collateral owned by Robertie—on account of loans she had made. (Exs. 5 & 11.) Another document, this one between Robertie and Marina, states that Robertie had loaned to Marina the same amount that Phyllis loaned Robertie—$486,521—and in exchange for the extinguishment of $383,710 of this debt, Marina transferred to Robertie all of Marina's personal property. (Ex. 6.) The next document is a transaction memorandum between Robertie and the newly incorporated Marine providing that Robertie was transferring to Marine the personal property that Marina had just transferred to Robertie in exchange for the extinguishment of the debt. (Ex. 8.) In exchange for the transfer of the property to Marine, Robertie received all of Marine's stock and a promissory note in the amount of $183,710. (Ex. 10.)

The business has struggled throughout its existence, culminating in Marina filing a Chapter 11 petition on June 17, 2004, and Marine filing a Chapter 11 petition on October 20, 2004. Sumac Corporation ("Sumac") is a secured creditor of the Debtors in the amount of $1,636,143[2] The Debtors

---

[1] Numerous dollar amounts are involved in this case. For the sake of clarity, the Court has omitted cents from the figures.

[2] For a more detailed history of the Debtors and their relationship with Sumac, see In re Newfound Lake Marina, Inc., 2006 BNH 038 (Bankr. D.N.H.).

initially scheduled Robertie's claim as an unsecured, nonpriority claim in the amount of $102,811.  This amount is the difference between the $486,512 allegedly loaned to the Marina and the $383,710 extinguishment that took place on June 1, 1993.  (Ex. 6.)  The Debtors subsequently amended their schedules to list Robertie's claim in the amount of $490,307.  (Ct. Doc. No. 96.)

## DISCUSSION

Sumac objects to Robertie's proof of claim on the grounds that there is no proof that Robertie actually loaned the amount he claims to have loaned, that any amounts he did advance were capital contributions rather than loans, that any allowable claims are barred by New Hampshire's statute of limitations, and that portions of the disputed claim should be disallowed as violative of a forbearance agreement between the Debtors and Sumac.  In the event that the Court allows all or some of Robertie's claim, Sumac argues that any allowed portion should be recharacterized as equity.

I. The Legal Standard

Because the Debtors' schedules list Robertie's claim as undisputed, non-contingent, and liquidated, Robertie is not required to file a proof of claim, as his proof of claim is deemed filed under 11 U.S.C. § 1111(a).  The following rules apply nonetheless.  A proof of claim filed in accordance with the requirements of Bankruptcy Rule 3001(f) constitutes "prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  This presumption of validity is rebutted if a creditor's "objection is supported by *substantial evidence*."  In re Hemingway Transp., Inc., 993 F.2d 915, 925 (1st Cir. 1993).  If the objector presents substantial evidence, "the burden shifts back to the claimant as it is ultimately for the claimant to prove his claim, not for the objector to disprove it."  Notinger v. Auto Shine Car Wash Sys., Inc. (In re Campano), 293 B.R. 281, 285 (D.N.H. 2003) (quotations omitted).

II.     Robertie's Claim

According to Robertie, he actually loaned a total of $678,071 to the Debtors between 1988 and 1996. This figure comes from a summary of the ledgers kept by Phyllis and includes loans noted in the ledgers to the Debtors from a variety of sources (discussed below), and Robertie asserts that the summary of the ledgers is proof of this amount. As an alternative to $678,071, Robertie claims to have proven that he loaned at least $592,000 to the Debtors (also discussed below). Robertie's bankruptcy claim, though, is $490,307, and he has not explained how he arrived at this precise figure, conceding at trial that he did not know how his claim was computed. (Tr. at 27.) Robertie did state, though, that $490,307 is a reduction from the actual amount of money—$678,071 or $592,000—that he has loaned the Debtors. The Court, therefore, is left guessing what the $490,307 claim is comprised of. In order to determine whether Robertie is entitled to any or all of his asserted claim, the Court will consider each amount that Robertie has claimed he has loaned to the Debtors.

    A.     The Ledgers

The $678,071 figure that Robertie claims he is actually owed—but that he is not seeking to collect— is the total of the loans recorded in the marina's ledgers. In addition to loans from Phyllis and Robertie, this figure includes loans totaling approximately $11,098 to which Robertie clearly is not entitled to collect, such as loans from Robertie's mother, an employee referred to as "Swede," Mark Greenwood (the Debtors' accountant), and a "Betsy." The Court does not agree with Robertie that because the marina is a family business he may recover these monies. These lenders could file their own claims if they are owed these monies.

Additionally, included in the $678,071 are monies coming from one or more savings accounts, as indicated by notations in the ledgers. Robertie testified that he did not know what these ledger notations referred to. (Tr. at 24.) He speculated that some of the money came from his own savings account, but he offered nothing beyond speculation. (Tr. at 29–30.) It is unknown from which savings accounts these

4

monies came from.  Robertie's speculation and uncertainty do not amount to a preponderance of the evidence that the money came from him or that the money was loaned.

The ledgers also show funds loaned to the marina by Home Bank and Community Guaranty Savings Bank & Trust ("Community Bank").  With regard to Home Bank, this loan is now held by Sumac, so Robertie clearly is not entitled to recover funds loaned by Home Bank.  The Community Bank loans are addressed below.

As to the $678,071 in total, Sumac has pointed to substantial evidence that casts substantial doubt on this figure, and the Court disagrees with Robertie that he has proved that he loaned this amount to the Debtors.  The $678,071 figure is derived from the ledgers, but the notations beside the entries are inconsistent and often do not adequately describe the source and nature of the funds.  The summary of the ledgers includes many loans from Phyllis and Robertie, and, as discussed in the next section, Robertie stated at his deposition that Phyllis's loans were repaid and that only capital contributions remained.

B.     Phyllis's and Robertie's Jointly Owned Money

Robertie testified that he and Phyllis put approximately $490,000 into the business, but he did not assert that this transaction was the basis for his claim, despite the figures being nearly identical.  According to Robertie (no documents were introduced to support his testimony), after his grandfather died in 1973, he and Phyllis became joint owners of Phyllis's home, bank accounts, and other property.  (Tr. at 69–71.)  In the 1980s, they sold the house and received approximately $390,000, and they liquidated bank accounts in the approximate amount of $100,000.  (Tr. at 71.)  Robertie testified that in May 1986, "we purchased" the marina, presumably using the approximately $490,000 from the joint property.  (Tr. at 72.)

5

The figure of $490,000, in addition to being almost identical to the amount of Robertie's claim, is almost identical to an amount involved in the June 1993 documents. According to some of those documents, Phyllis had loaned $486,521 to Robertie prior to June 1, 1993, and then Robertie, in turn, loaned the same amount to Marina.[3] Because the June 1993 documents involve $486,521 being loaned from Phyllis to Robertie to Marina prior to 1993, and because Robertie testified to an almost identical amount of approximately $490,000 that he and Phyllis owned jointly and put into the Marina prior to 1993, the Court concludes that the $486,521 and the $490,000 jointly owned money are one and the same.

Having established the identity of the $486,521 and being satisfied that this is the same joint money used to purchase the marina, ownership of the money—i.e., whether it belonged to Phyllis, Robertie, or was jointly owned—is irrelevant because the Court finds that this money was capital rather than loans. In order to determine whether money loaned to a debtor should be treated as debt or recharacterized as equity, this Court generally considers the following eleven factors:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

---

[3] With regard to a "Memorandum of Debt" that is represented as an agreement between Phyllis and Robertie that documents the amount of her loan to Robertie, only Robertie signed it. Robertie testified that he did not think Phyllis would have signed the agreement, which does little to convince the Court that this document describes actual loans. (Tr. at 43.)

  (9) the extent to which the advances were subordinated to the claims of outside creditors;

  (10) the extent to which the advances were used to acquire capital assets;

  (11) the presence or absence of a sinking fund to provide repayments.

In re Micro-Precision Techs. Inc., 303 B.R. 238, 246 (Bankr. D.N.H. 2003) (quoting In re AutoStyle Plastics, Inc., 269 F.3d 726, 749–50 (6th Cir. 2001).  Recharacterization does not hinge on any one particular factor, and "[t]he more [a transaction] appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt."  Id. at 246–47 (alterations and omission in original) (quoting In re AutoStyle Plastics, Inc., 269 F.3d at 750).

  Application of the factors shows that the joint money was equity rather than a loan.  No instrument was made prior to June 1993 to evidence the debt.  Robertie testified that he and Phyllis bought the marina using the jointly owned, approximate amount of $490,000.  Robertie and Phyllis are the very people who had control over the business.  The marina credits the testimony and report of the Plaintiff's expert witness who concluded that the Debtors were undercapitalized.  (Ex. 40.)  Further, Robertie testified at a deposition that he did not make loans to the marina, but that Phyllis had done so.  Then, at trial, Robertie testified that a $455,849 figure listed in a 1998 document as a "loan" from Phyllis is the same loan owing him, explaining that "Phyllis and I were basically one and the same person, so we just used her name on the books."  (Ex. 137; Tr. at 112.)  While this may be true, Robertie testified at his deposition that all of Phyllis's loans had been repaid and all that remained was, in his words, their "capital contribution."  (Tr. at 12.)  If this is true, the $486,521 or the jointly owned $490,000—which amounts the Court determined above to be one and the same—are not loans due either Phyllis or Robertie, but capital contributions.  Even if Robertie erred at his deposition when he stated that only capital contributions remained unpaid, the evidence indicates that these amounts are not loans.[4]

---

  [4] The Court also notes that the June 1993 documents purport to extinguish this debt to the extent of $383,710.

C.      Robertie's Original Claim of $102,811

Originally, the Debtors' petitions listed an unsecured non-priority claim held by Robertie in the amount of $102,811. The figure of $102,811 is derived from one of the June 1, 1993, documents and is the amount purportedly remaining due to Robertie after the extinguishment of $383,710 debt. Recall that Robertie had purportedly loaned $486,521 to Marina, and that in exchange for extinguishment of $383,710 of this debt, Marina transferred property to Robertie. Thus, there remained $102,811 of alleged, unextinguished debt owing Robertie.

The Debtors' amended schedules do not list the $102,811 figure, but replace the $102,811 with the amount of $490,307. Apparently, Robertie is no longer claiming to be owed the $102,811, as this amount does not appear to be part of the $490,307. In his post-trial memorandum, Robertie confusingly states that although he is asserting a claim of only $490,307, he proved at trial that he actually loaned either $678,071 or, at least, $592,000. The $592,000 figure seems to be the sum of $490,307 and $102,811. (Ct. Doc. No. 313 at 5–6.) If Robertie claims to have proven that he loaned $592,000 but he is only seeking a claim of approximately $490,307, the only logical result is that the $102,811 is not part of his amended claim. Even if Robertie had included the $102,811 in his amended claim, it would not be allowed because it is a portion of the $486,521, which the Court has determined to be capital. Because Robertie does not seem to have included it in his claim and because it is a capital contribution and not a loan, the $102,811 is not allowed as part of Robertie's claim.

D.      The $183,710 Promissory Note

The only promissory note that Robertie holds from either of the Debtors is for $183,710, given by Marine.[5] (Ex. 10.) The note is part of the June 1993 documents and was given to Robertie, along with all of Marine's stock, in exchange for the transfer to Marine of the personal property formerly belonging to

---

[5] Robertie claims that the amount due on the note is now $337,494, based on seven percent interest accruing from the date of the note and the petition date—ten years and 349 days.

Marina. Robertie has not explained how the amount of the note fits into the amount of his claim. Besides the mere existence of the note, Robertie has not proven that he is in fact owed the amount of the note. In fact, the preponderance of the evidence shows that this was never—or no longer is—a loan to the business that Robertie expected to be repaid. "Some demand notes are not enforced because the payee has forgiven the debt. This is particularly true in family and other noncommercial transactions. . . . The maker may be a relative and it may be difficult to determine whether the note represents a real or forgiven debt." N.H. Rev. Stat. Ann. § 382-A:3-118 cmt. 2 (1993).

Applying the recharacterization factors to the note results in almost every factor supporting recharacterization of most of the claim as equity. While the promissory note does have a repayment term, "on demand," there is no schedule of payments, no payments have been made, and Robertie has allowed the U.C.C. statement to lapse. And while the note does provide a fixed interest rate, seven percent, no schedule of interest payments exists nor have any interest payments been made. As for the source of repayments, there is no evidence that Robertie ever intended to be repaid, and repayment would have been contingent on the success of the business. See Roth Steel Tube Co., Inc. v. Comm'r, 800 F.2d 625, 631 (6th Cir. 1986) ("If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."). Also, Marine's balance sheets routinely included a category entitled "Note Payable—Officer" but the amount of this note was not listed. (Exs. 113, 116, 123, & 125.) The Court also considers it quite telling that despite this being the only promissory note in existence between the Debtors and Robertie, the note was not scheduled in the Debtors' original schedules, especially when the Debtors did schedule $102,811, which was another amount documented, though not explicitly, in the June 1993 documents.

As for the adequacy or inadequacy of capitalization, the evidence suggests that the Debtors were undercapitalized. The marina has chronically struggled to service its debt. Also, the Court credits the Plaintiff's expert's testimony and report in which he concluded that the Debtors were undercapitalized.

(Ex. 40.) Factor number six considers the identities of the creditor and the stockholder. In the instant case, both are Robertie, who also controlled the operations of the Debtors as the sole principal, officer, and director. See In re Hyperion Enters., Inc., 158 B.R. 555, 561 (Bankr. D.R.I. 1993) (identifying "the amount or degree of shareholder control" as a relevant recharacterization factor). Next, no security was given for the advances except for the promissory note, and the note does not appear to be contemporaneous with the advances nor is the discrete amount of $183,710 memorialized elsewhere in the record. As for factor number seven, the loan documents between Sumac and the Debtors prohibited the Debtors from taking on any more outside debt. Further, given the Debtors' lack of ability to service its existing debts, the Court doubts their ability to successfully court additional outside lenders. Robertie has also agreed to subordinate his claim to the claims of other creditors. As for whether the money extended by Robertie was used to acquire capital assets, neither party focused on this, and even considering this factor in the light most favorable to the Debtor, the weight of the other factors renders this factor unimportant. Finally, there was no sinking fund established to make repayments on the debt, and no repayments have been made.

Besides the bare existence of the note, Robertie has not presented evidence to counter the substantial evidence that the note is not a loan. The evidence strongly suggests that the reason the note was not kept track of over the years and originally scheduled in bankruptcy is that it was not considered to be a debt. Robertie has not carried his burden, and the Court concludes that the $183,710 note is equity.

      E.      The Debtors' Tax Returns and Balance Sheets

In addition to the ledgers, Robertie asserts that his claim is documented and proved by the Debtors' tax returns and balance sheets. Robertie produced Marine's tax returns for the period of 1993 through 2004. The returns consistently include an amount in the "Loans from stockholders" line item. The 1993 return shows, for example, that between May 1993 and March 31, 1994, the "Loans from

stockholders" grew from zero to $282,354. (Ex. 111). Robertie has not given any explanation of how this figure was computed. Robertie testified that his accountant prepared the tax returns by examining the ledgers. However, neither the ledgers nor the summary of the ledgers substantiates the figures reported on the tax returns. Rather than showing an increase of $282,354 between May 1993 and March 31, 1994 (as shown in the tax return), the summary of the ledgers shows a total of $20,550 loaned to the business in that time. (Ex. 1.) Further, many of the entries in the summary of the ledgers for this time period are not loans from stockholders. The numbers contained in the ledgers and the tax returns simply do not support each other. Although the balance sheets tend to report the same amount as reported on the tax returns, this proves nothing, as the preparer of the balance sheet likely borrowed the number from the most recent tax return. The balance sheets, though, are not altogether consistent. For example, it was reported on March 31, 1995, that there was a note payable to officer of $433,598. The next balance sheet was dated December 31, 1995, and the only note payable to any shareholder was reduced to $102,811.[6] However, a few months later, on March 31, 1996, the note payable to Robertie was back up to $407,654. It is interesting that the amount of the only existing note—$183,710—is not listed on any of the balance sheets at the "Loans from stockholders" line item.

      Although the figures are generally consistent in that the one year's tax return begins with the amount due Robertie that the previous year ended with, this consistency does not explain where the numbers come from. The tax returns do not jibe with the ledgers, and the balance sheets do not always jibe with the tax returns. Given Robertie's lack of knowledge concerning how he came up with the amount of his amended claim and his belief that he is entitled to collect all the money ever loaned to the business from whatever source, the Court cannot accept the tax returns or balance sheets at face value.

      While the Debtors' tax returns and balance sheets, as well as the ledgers discussed above, indicate that Robertie has contributed a substantial amount of money to the Debtors, Robertie has, for the

---

[6] The Court notes that this figure is the same as the amount of debt not extinguished when Robertie transferred the property to Marine, as detailed in the June 1993 documents.

11

most part, failed to prove what amounts were advanced by him or explain why he claims $490,307. As for money that Robertie did contribute to the Debtors, Robertie has failed to present evidence or persuading testimony that most of this money was intended as a loan. As discussed above, the recharacterization factors weigh heavily against Robertie. The burden to prove his claim is on Robertie, as Sumac has met its burden by presenting substantial evidence that casts substantial doubt on Robertie's claim. The amounts included in the tax returns, balance sheets, and ledgers are not allowed as a result of ordinary proof-of-claim analysis, as Robertie has not met his burden, without the need for a recharacterization analysis.

      F.     <u>Community Bank</u>

Robertie claims that he is owed $292,500, arising from loans originally between the Debtors and Community Bank. According to the ledgers, Community Bank loaned approximately $171,418 to the Debtors between 1993 and 1996.[7] At some point, Community Bank refused to continue lending to the Debtors and insisted upon a security interest in Robertie's residence. (Tr. at 21–23 & 48.) Robertie testified that he essentially transferred the marina debt to himself by taking out a personal loan secured by a mortgage on his house and paying the marina debt. Robertie subsequently refinanced the debt with Washington Mutual, and then again with Ameriquest, the latter refinance occurring in January 2006.

The Ameriquest refinance was for $292,500, the breakdown of which is provided in the HUD settlement statement. According to the statement, $18,675 was paid for settlement charges, Robertie received $22,932, and the payoff to Washington Mutual was $145,756. (Ex. 163.) The statement also lists another payoff of $105,135 and states to "See Addendum," apparently to find out to whom the payoff went to. The addendum was not attached to the exhibit or otherwise produced during the trial. According to Robertie, the $105,135 was used to "clean up some of the IRS issues that were existing,

---

[7] This figure is certainly not accurate, but it is the sum of the ledger entries that either mention Community Bank or that contain likely references to Community Bank, such as "Loan Com."

penalties, civil penalties they filed against me, and some other debt that was not able to be covered by the bankruptcy." (Tr. at 81.) Although Robertie then clarified that these debts were those of the Debtors rather than himself personally, his statement is all the evidence there is. Coupled with the nonproduction of the missing addendum or any other document explaining to whom or for what the $105,135 went, the Court concludes that Robertie has not carried his burden of proving the merits of this portion of his claim.

With regard to the $145,756 paid to Washington Mutual and now owing to Ameriquest, Robertie testified credibly that he had taken a personal loan to pay the Debtors' debt and that he is now personally obligated for that amount. Beyond Robertie's testimony, there is evidence that the Debtors received loans from Community Bank, as the ledgers note several such loans. Combined with Robertie's testimony, this proves that the business benefitted from the Community Bank loans. Also, there is no question that Robertie is now personally liable for this debt. Robertie signed the loan documents in his personal capacity, and neither Debtor listed Washington Mutual—the holder of the loan on the petition date— as a creditor in their schedules. (Exs. 160, 161, 162 & 163.) The Court concludes that Robertie has proven his claim for $145,756 by a preponderance of the evidence. In addition, Robertie is entitled to include in his claim fifty percent of the settlement charges—$9,337—because Robertie's allowable claim represents approximately fifty percent of the $292,500 refinance to which the settlement charges applied. Thus, with regard to the Community Bank loans, Robertie's claim is allowed in the amount of $155,093.

With regard to recharacterization, the Court declines to recharacterize as equity the allowed portion of Robertie's claim. Robertie's testimony convinced the Court that his placing of the business debt on his personal residence was an event that was above and beyond his routine infusions of cash into the business. The Community Bank loan is different from the other alleged loans made by Robertie. The other amounts put forth by Robertie—i.e., $490,307, $592,000, and $678,071—are unsupported amalgams of dollar amounts that appear and disappear, and grow and shrink throughout the Court's

13

record, with no documentation or testimony explaining these contractions.  The Court agrees with Robertie that troubled debtors must be able to borrow money from their principals because when a business is in trouble, its borrowing options are limited.  The Court also understands Robertie's concern that recharacterization of claims might deter principals from loaning money to businesses when the business is in trouble.  In this case, Robertie testified that he took on the Community Bank obligation personally because Community Bank insisted on it.  (Tr. at 22 & 48.)  The marina business was struggling and Robertie apparently had few options.  This circumstance and the documentation supporting the Community Bank transaction convince the Court that the allowed portion of Community Bank loan should not be recharacterized as equity.

Sumac argues that the statute of limitations bars Robertie's claim, though Sumac has not requested a ruling of law that the portion of Robertie's claim attributed to the Community Bank loans is barred by the statute of limitations.  Sumac argues only that the portions arising from the note, the nonextinguished $102,811, and the advances indicated in the ledgers are barred.  Sumac also argues that Robertie should be equitably estopped from pressing his claim because he was a signatory to an agreement between the Debtors and Sumac in June 1997 that forbade the Debtors to incur additional debt.  However, the Debtors were already liable to Community Bank at the time Robertie stepped in.  Thus, no

new debt was incurred. Also, it appears that Robertie took on the mortgage prior to June 1997. As to the rest of the challenged loans, the Court has now characterized them as capital contributions to which the statute of limitations would not apply.

## CONCLUSION

For the reasons set forth above, Robertie's claim is allowed in the amount of $155,093. This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate order consistent with this opinion.

DATED this 14th day of September, 2007, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge