**2008 BNH 005**

_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 04-12192-MWV
                                                                Chapter 11
Newfound Lake Marina, Inc.                                      Substantively Consolidated
and Newfound Marine, Inc.,
                  Debtors

*William S. Gannon, Esq.*
*WILLIAM S. GANNON, PLLC*
*Attorney for Debtor*

*Joseph A. Foster, Esq.*
*Cheryl C. Deshaies, Esq.*
*McLANE, GRAF, RAULERSON & MIDDLETON*
*Attorneys for Sumac Corporation*

## MEMORANDUM OPINION

The Court has before it the motion of Newfound Lake Marina, Inc., and Newfound Marine, Inc.,

which Debtors have been substantively consolidated (hereinafter, the "Debtor"), for valuation of Sumac's

interest in the Debtor's interest in its property, limit collateral to prepetition property, and limit collateral

based on the equities of the case. The motion also requests that the Court authorize the Debtor to borrow

$3,000,000. In essence, the Debtor asks this Court to find that the Debtor's interest in the value of the

real property should be valued on the basis of how the marina operated at the date of the filing of the

petition, which it alleges is valued at $1,231,000, less payments of $121,000 made during the case, for a

value of $1,110,000. The Debtor asserts it should be further reduced by the value of the personal

property for a final value of $879,000. Under this scenario, Sumac would be an undersecured creditor

since the Court has previously found that the Sumac claim is $1,636,000 as of the filing date. The Debtor

further argues that the permits obtained during the course of the proceedings have their own intrinsic

value and are not subject to Sumac's mortgage and security interest. The final argument that the Debtor

makes is that whatever value the Court finds, that value should be substantially reduced pursuant to the

"equities of the case."

Sumac objects to the motion indicating that the value of the marina is $2,200,000, that the permits have no value on their own, but are inherent to the real estate, and that the request to borrow $3,000,000 should be denied because it is a *de facto* plan without the inherent protections of the plan process.

The Court held a hearing on the motion on April 3 and April 16, 2008.  Subsequent to the final hearing, both parties filed post-trial memoranda.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## FACTS

The Court will briefly cite what it considers to be the relevant facts.  Newfound Lake Marina, Inc., filed a voluntary petition on June 17, 2004.  Newfound Marine, Inc., filed its petition on October 20, 2004.  On January 19, 2005, this Court substantively consolidated the two Chapter 11 estates.  On the date of the filing, the Debtor operated a marina with approximately 111 slips, including seventy-five bank slips.  In 1990, the Debtor borrowed $1,225,000 from HomeBank, FSB.  In 1995, Sumac purchased the note and collateral package from Resolution Trust.  Sumac is an entity specifically formed for this transaction whose principal is P. Andrews McLane.  Sumac is also now an abutter of the marina property.  During the course of this Chapter 11, the Debtor has diligently pursued obtaining the permits necessary to complete its dockominium plan and hopefully be able to reorganize.  The Court authorized the Debtor to hire special counsel to pursue these permits.  Sumac and Grey Rocks Land Trust, a McLane family entity, have diligently opposed the granting of the permits as abutters.  Despite these objections, the Debtor now has substantially all of the permits required to complete its dockominium plan.

## DISCUSSION

The crux of the appeal revolves around two sections of the Bankruptcy Code.

(a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

. . . .

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

. . . .

(b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. §§ 506(a)(1), (b) and 552(b)(1).

In order to determine the extent of Sumac's secured claim, the Court must value the collateral held by Sumac, namely, the real property being operated as a marina. In order to find this value, the Court must first decide what standard to use and at what time. The Debtor argues that the determination should be as of the filing date, taking into consideration the physical condition of the property and manner in which the marina was then operated.

- 3 -

At trial, a considerable amount of the testimony was given as expert testimony by appraisers hired by the Debtor and by Sumac.  Both appraisers testified that the highest and best use at the time of the filing, and more recently, was as a dockominium or similar method of slip ownership.  Both agreed that the definition of highest and best use is the "reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."  (Ex. 29 and 114.)  A considerable amount of the testimony revolved around whether the dockominium was a legal use in the context of the above definition.  The Dictionary of Real Estate Appraisal, 4th edition, defines legal permissibility as "[o]ne of the four criteria the highest and best use of a property must meet; a property use that is either currently allowed or most probably allowable under zoning codes, building codes, environmental regulations, and other applicable laws and regulations that govern land use restrictions."  (Ex. 118.)  There is no dispute that, at the time of the filing, the premises was being operated as a marina and had authority from the New Hampshire Department of Environmental Services Wetlands Board for 111 slips.  (Ex. 104.)  Apparently, the current project reduces this amount to ninety-five slips.  The Court finds that the proposed use is most probably allowable as used in the above definition.

Having found the dockominium to be the highest and best use, the Court must next decide how to value it.  The Court believes the First Circuit case, <u>Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.)</u>, 50 F.3d 72 (1st Cir. 1995), to be right on point.  In that case, like this case, the court was asked to value collateral in order to ascertain the amount of the second mortgagee's lien for the purpose of its treatment under the debtor's plan of reorganization.  The debtor in that case was to continue to own the property for the purpose of generating income.  That is the situation in this case.  Under these conditions, the court found that "Winthrop proposes in its Plan to retain control of the Property and continue using it in its nursery and landscaping business to generate income.  In light of this proposed use, the bankruptcy court committed no error in valuing the Property at

its stipulated fair market value." In re Winthrop Old Farm Nurseries, 50 F.3d at 76. The Court finds that

the value of the property in question is to be determined pursuant to its fair market value.

At trial, the Debtor and Sumac offered appraisal testimony through their respective expert

witnesses. The Debtor's expert was Stephen G. Page of Plymouth, New Hampshire. Sumac's expert was

James G. Bragg, Jr., of Resort Realty Advisers. Each appraiser had performed two appraisals as follows:

|  | Date | Amount |
|---|---|---|
| Page | March 24, 2006 | $2,500,000 |
|  | April 2, 2008 | $4,300,000 |
| Bragg | February 7, 2005 | $2,200,000 |
|  | March 13, 2008 | $2,000,000 |

The principal difference between the two appraisers' opinions was the price per slip that each thought the

Debtor could obtain. Bragg testified that his March 13, 2008, appraisal was lower largely because of the

increased cost of construction. Both appraisers used similar methodology, were well-prepared, and

credible witnesses. For purposes of the valuation of Sumac's secured claim, this Court elects to adopt the

more conservative March 13, 2008, appraisal of Sumac's appraiser, Bragg, in the amount of $2,000,000.

Next, the Debtor argues that there should be a substantial reduction in this amount pursuant to the

"equities of the case" under section 552(b)(1). It argues that the actions of Sumac in objecting to the

obtaining of the permits have delayed the case and increased the costs of construction. It also argues that

Sumac has benefitted by the cost of the permitting, namely $100,000, to special counsel.

Once again, there is a First Circuit case on point, which this Court has already indicated that it

intended to rely on in granting Sumac's motion in limine at the start of trial. In that case, the court was

asked to broadly interpret the phrase "equities of the case." After reviewing the legislative history of the

phrase, the court held—

> We can only conclude from our reading of these reports that the "equities of the case"
> proviso is a legislative attempt to address those instances where expenditures of the estate
> enhance the value of proceeds which, if not adjusted, would lead to an unjust
> improvement of the secured party's position. In such cases Congress intended for courts

to limit the secured party's interest in the proceeds according to the equities of the case so
as to avoid prejudicing the unsecured creditors.

New Hampshire Bus. Dev. Corp. v. Cross Baking Co., Inc. (In re Cross Baking Co., Inc.), 818 F.2d 1027,

1033 (1st Cir. 1987).

     This Court adopts the narrow construction of the phrase as expressed by the First Circuit in Cross

Baking and declines to reduce the value resulting from the alleged acts of Sumac in objecting to the

obtaining of the permits, which the Debtor argues caused delay and increased costs.  This argument might

better be the subject of an adversary proceeding.

     The Court does, however, find that the $100,000 expense paid by the Debtor is the kind of

expense contemplated by the First Circuit in Cross Baking that inures to the benefit of Sumac and will

reduce the value by $100,000, leaving the final value at $1,900,000.

     The Debtor further argues that the permits have their own value and that Sumac does not have a

security interest in these permits.  The Court does not have to reach this argument because it believes that

the value, if any, is inherent in the property covered by the mortgage, which property was appraised by

Bragg as of February 7, 2005, at $2,200,000 and Page as of March 24, 2006, at $2,500,000.  In arriving at

this value, the appraisers assumed that the permits would be obtained, which, in fact, turned out to be true.

Unlike the Wood case cited by the Debtor (Wood v. LA Bank and First Fed. Sav. & Loan of Rochester,

(In re Wood), 190 B.R. 788 (Bankr. M.D. Pa. 1996)), no zoning change was required to create the

dockominium as the premises at the date of the filing was being used as a marina and had authorization

for 111 slips.  Lastly, there was insufficient evidence, if any, that the permits had any intrinsic value if not

attached to the property subject to the mortgage by Sumac.

     Finally, the Debtor, through the motion, wants the Court to approve the borrowing of $3,000,000.

The Court agrees with Sumac that at this state of the reorganization, the borrowing should be incorporated

into the Debtor's plan.  The Court, in any event, based on the limited testimony at trial on this borrowing,

does not believe the Debtor met its burden to justify the terms of the borrowing as presented.  This

opinion may also bring into question whether the borrowing, as proposed, is sufficient.  The request to borrow is denied.

### <u>CONCLUSION</u>

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.

DATED this 12th day of May, 2008, at Manchester, New Hampshire.


/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge